## MARTOCELLO v. KOBASH.
### Patent Appeal No. 2272.

Court of Customs and Patent Appeals.
April 14, 1930.

Rehearing Denied May 19, 1930.

William Steell Jackson, of Philadelphia, Pa. (Charles S. Grindle, of Washington, D. C., of counsel), for appellant.

Leonard L. Kalish (E. Hayward Fairbanks, both of Philadelphia, Pa., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the Patent Office in an interference proceeding, reversing a decision of the Examiner of Interferences and awarding priority of invention of the device in issue to appellee herein, the junior applicant.

The invention in issue is well described by the Examiner of Interferences as follows:

"The invention in issue relates to a refrigeration system and more especially to a means for aerating water during a freezing operation. Water to be frozen is placed in a can into which a hanging tube is inserted, said tube being supplied with air at its upper end. The air supplied to the tube escapes to the water through perforations in the tube. The specific issues of this interference involves a structure for supporting the tube and allowing freedom of motion of the same in relation to the can. Each tube is suspended from a cross bracket support which support is adapted to be vertically positioned as desired with respect to the can. The tube passes through a large hole in the bracket, said hole having a substantially semi-spherical scooped-out portion at its upper end. The hanging tube has a substantially ball shaped protrusion fixed thereto which is adapted to nest and be supported in the scooped-out portion of the bracket. The tube is thus substantially universally supported by the bracket, said tube being movable within the can as desired."

The six counts of the interference are as follows:

"Count 1. In a device of the character stated, a brine receiving tank, a freezing can, a member arranged upon the can top and provided with a socket, a ball-like member having an aperture therethrough seated in said socket, an agitator tube penetrating the said aperture, and means for securing said tube to said member.

"Count 2. In a device of the character stated, a brine receiving tank, a freezing can, a horizontally disposed member arranged upon the can top and provided with a depending socket, a ball-like member having an aperture therethrough seated in said socket, an apertured agitator tube penetrating the said aperture, and means adjacent the tube top for securing said tube to said member.

"Count 3. In a device of the character stated, a member adapted to support upon a

freezing can, said member being provided with a socket, and an air tube having its upper end secured to a ball-end bearing positioned within said socket, said ball-end bearing having an opening therethrough.

"Count 4. In an ice plant, the combination of an ice can, a bracket adapted to be supported thereon and having a passage therethrough an air drop tube adapted to be positioned in said ice can and having its upper end loosely passing through the passage and a support for the tube mounted upon the upper end of the tube above the bracket and having ball-end bearing with the bracket.

"Count 5. In an ice plant, the combination of an ice can, a bracket adapted to be supported thereon and having a passage therethrough and the walls of the latter shaped to form a semi-spherical seat for a ball, a ball positioned on said seat, and a perforated air tube secured to said ball, and depending therefrom within said can, said ball and air tube being adapted to be lifted vertically upwardly from said seat.

"Count 6. In ice making apparatus, a bracket adapted to engage the rim of an ice can and having a passage therein, in combination with an air tube passing downwardly through the passage, and a support for the air tube about the upper end of the tube forming a universal joint with a wall of the passage."

Appellant filed his application on November 14, 1923; appellee filed on March 29, 1924. Appellant took no testimony, relying upon his filing date. Appellee took the testimony of a number of witnesses.

Appellee in 1921 was an engineer and repairman in the plant of the Delaware Storage & Freezing Company in Philadelphia, and was also in charge of the Quaker City Plant owned by said company; said company being controlled by one Serrill who was a witness in this case.

Appellee claims to have conceived the device in issue in June, 1921, disclosed it to others, and reduced it to practice in September, 1921. The Examiner of Interferences found conception by appellee as early as September, 1921, but that his claimed reduction to practice in September, 1921, was an abandoned experiment and not a reduction to practice; that, while he was the first to conceive, he was the last to reduce to practice, and that he was not diligent in reducing to practice.

The Board of Appeals found that the tests of appellee's device in September, 1921, clearly amounted to successful reduction to practice of appellee's invention, that appellee was using diligence, and that he had not abandoned the ball and socket support which is the gist of the invention here in issue.

The record is very unsatisfactory, due in large part to the conduct of appellee's counsel in taking the testimony. Upon numerous occasions he propounded flagrantly leading questions, which were objected to by appellant's counsel as leading. For many such questions there was not the slightest excuse, and counsel propounding them must have known that, if asked in court, the objection to them would have been sustained. In the consideration of the testimony we have excluded answers to questions where the objection to them as leading should be sustained.

We think that the testimony establishes conception by appellee of the invention and disclosure to others prior to September, 1921, that at least one crude model of the device was constructed, and that tests were made during that month. The appellee testified that the result of the tests was very good.

William Brownlow, a witness on behalf of appellee, testified that he was a refrigerating engineer, also in the employ of the Delaware Storage & Freezing Company in 1921; that appellee disclosed to him the invention in issue in June, 1921; that he observed the tests of it in September, 1921; and that "we made good marketable ice with it at that time."

Horace P. Serrill, president of the company employing appellee at that time, testified that he observed the tests of the device, and that it "made very good commercial ice while in use." This witness, however, seemed to have a very hazy idea of what the device was.

James S. Gradwell testified that he was counsel for the Delaware Storage & Freezing Company and chairman of its board of directors; also that he was treasurer of George Gumphert & Sons Company, operating a pattern and machine shop. He further testified that appellee showed him drawings of the device in September, 1921; that in June of the same year the appellee constructed a device embodying his invention; that it was made of a piece of wood, a metal tube, a wooden ball, and rubber tube. He identified the device shown him as Exhibit 7, or one similar to it, which was placed in evidence. We have examined said Exhibit 7, and find that it is a very crude device, but does fully embody the invention here in issue. Mr. Gradwell further testified that he left for his annual vacation the last week in June, and

returned the Tuesday following Labor Day in September, at which time he found appellee's device being tested with a number of devices like Exhibit 7; that these tests continued for three or four weeks; that he saw the tubes in operation nearly every day; that the ice produced in the tests "was good marketable ice and comparable with any ice that I have ever seen produced." The value of this testimony must be considered in connection with the fact that Kobash testified that he first constructed a model of his device in September, 1921. It is clear that the witness Gradwell was, to say the least, mistaken in his testimony that he saw the model in June.

This is, in substance, all of the admissible testimony with regard to reduction to practice, and, if standing alone, we should hold that appellee had sustained the burden upon him to establish by a preponderance of evidence conception and reduction to practice of the invention prior to appellant's filing date.

There are, however, two circumstances that must be considered in connection with this testimony. The evidence shows that the Delaware Storage & Freezing Company reconditioned one of its plants known as the Delaware Plant in the latter part of 1922 and the early part of 1923. The witness Serrill, its president, testified that during the years 1921, 1922, and 1923 they were having serious difficulty with the quality of the ice produced; that in the latter part of 1921 they built another plant known as the Quaker City Plant, of which appellee was made chief engineer, and that they also had great difficulty with the ice produced in that plant until they installed what the witness described as the "Kobash system" in 1924. By the "Kobash system" the witness evidently meant appellee's device here in issue, and possibly other devices originated by appellee. No effort was made to install appellee's device in either of the plants between 1921 and the time they were installed in the early part of 1924, which was after appellant filed his application.

Appellee testified that in November or December, 1923, through the witness Gradwell, he had a conference with Messrs. Linck and Fryling, who were the active representatives of Gumphert & Sons Company, relative to it undertaking the manufacture of appellee's device; that appellee did not either show or disclose to them, at his first meeting, the device here in issue; and, while the testimony is not direct upon the point, it is clearly to be inferred that appellee showed and disclosed to Messrs. Linck and Fryling a device which had features quite distinct from, and performing functions different than, the particular device here in question. So far as the aeration and agitation of the water in the ice cans was concerned, the feature of the device shown by him did not contain the ball and socket joint, which is the one here in issue, but had the feature of the tube mounted to swing on a trunnion in one plane. As a result of this interview, the Gumphert Company undertook to finance the patenting of appellee's device so shown and disclosed to its representatives, and the manufacture of it for commercial purposes.

The witness Linck testified that in the device first shown and disclosed by appellee to him the tube "swung from two lugs or brackets and in a single plane; it couldn't work any other way." Immediately following, the following question was asked and the answer given, the Exhibit 2 referred to being the device as finally manufactured by the Gumphert Company:

"Q. Do you remember the circumstances under which you changed to the universal joint support as in Exhibit 2? A. In the original state as brought to me the model had the lugs as described in the above question, but on application for patent we found there was something similar and on suggestion of Mr. Kobash we changed to ball or universal joint."

The witness testified that, after this first interview with appellee, he caused a search to be made in the Patent Office to ascertain whether there was anything conflicting with appellee's device as shown to him; that such a search revealed that there was an outstanding patent which had the trunnion device with the tube swinging in one plane only, and that it was for that reason that the device was changed to the ball and socket joint, which is the one here in issue. He further testified that appellee, Kobash, with the assistance of the Gumphert Company, applied for a patent on January 26, 1924, upon the device first shown and disclosed, and that a patent was issued to appellee on September 16, 1924. A copy of this patent was placed in evidence; an examination of it discloses that much of the invention claimed therein had nothing to do with the question here at issue. The drawings, however, do show that the tube through which the water was agitated and aerated was swung on trunnions in one plane and not on a universal or ball and socket joint, and one of the claims in said patent carries that feature as a part of a combination claim.

The witness Fryling testified that he was connected with Gumphert & Sons Company, and had an interest in the corporation. He corroborates Mr. Linck's testimony above set out. In his testimony he said: "As nearly as I can recollect the tube would swing lengthwise of the can and we found that this would conflict with other patents and we immediately made the tube so it would swing on a ball joint. * * *" He stated that they proceeded to manufacture dies for the device shown by appellee at the first interview, and that it was about a month later that the construction was changed so as to provide for the ball and socket joint. The witness testified that they manufactured and installed about 1,000 or 1,200 of the device here in issue.

The witness Serrill testified that in 1924, or shortly before, they installed 900 or 1,000 of appellee's devices in ice plants of the Delaware Storage & Freezing Company.

There are, therefore, two circumstances which must be weighed in connection with testimony of a successful reduction to practice of appellee's device in 1921. It is a remarkable fact that, if there was a successful reduction to practice at said time, appellee's employer, which was having great difficulty in 1921, 1922, and 1923 in producing good ice, did not utilize the device until 1924, when the president testified that in 1921 the device made good ice and the witness Gradwell, chairman of the board of directors, testified that it made as good ice as he had ever seen.

The other remarkable circumstance is that, if there had been successful reduction to practice of appellee's device, he did not disclose the device to the representatives of Gumphert & Sons Company when he first interviewed them. Appellee testified that the reason that the trunnion form of device was used was because the representatives of Gumphert & Sons Company said that it would be cheaper to manufacture such a device than to manufacture the one having the ball and socket; but the testimony is clear that appellee did not disclose to the Gumphert Company the ball and socket device at all in his first interview, but did disclose another device performing in part the same function; and that the ball and socket device was not disclosed until after it had been ascertained by the Gumphert Company that there was an outstanding patent upon the tube supported by trunnions and swinging in one plane only.

When we consider these two circumstances of failure of appellee's employer to use the device here in issue for a period of nearly three years, when it was greatly needed, and appellee's failure to disclose the device here in issue to his manufacturer until it was ascertained that a patent had been issued for another device that he had disclosed, we are compelled to come to the conclusion that, whatever may have been done by appellee in 1921, it was nothing but an experiment, and was abandoned by him. There is no testimony that he did anything with regard to the device here in issue between the latter part of 1921 and December, 1923, or January, 1924, when it was disclosed to him that a prior patent was in existence for the device supported by trunnions and swinging in one plane only. This was after appellant filed his application.

■■ Appellee, therefore, although the first to conceive, was the last to reduce to practice, for we hold that under the evidence there was no reduction to practice prior to appellant's filing date. Therefore, in order for appellee to prevail, the burden is upon him to show that he was diligent from just prior to the time that appellant entered the field, November 14, 1923, until he actually reduced his device to practice or until he filed his application on March 29, 1924, if the latter date was earlier than actual reduction to practice.

■ There is no evidence of any specific acts of appellee having to do with the invention in issue from the latter part of 1921 until after appellant filed. The first activity of appellee shown by the testimony is his meeting with Fryling and Linck of the Gumphert Company, through previous talks with Mr. Gradwell, which meeting, we think, is established as taking place in December, 1923. As has already been pointed out, at that time he approached Fryling and Linck with the intent to patent and secure the manufacture of an article not embraced in the issue herein, but something else; and it was only after information was received that the first submitted device was anticipated that appellee advanced the proposition of patenting and manufacturing the device here in issue. There was no duty of diligence upon his part until immediately prior to November 14, 1923, appellant's filing date; but sickness and poverty of appellee are asserted as excusing delay between November 14, 1923, and his meeting with said Linck and Fryling and discussing with them the question of patenting and manufacturing the device here in issue. The Examiner of Interferences in his decision said: "It is not clear that the ball

and socket form would ever have been submitted to Fryling and Linck had not the trunnion form been old in the art." In our view, there is no testimony whatever that it would ever have been submitted to them or to any one else had it not been found that the trunnion form was old in the art.

With regard to sickness and poverty of appellee excusing him for the delay in reducing his invention to practice, either by filing an application or actual reduction to practice, the testimony does show that appellee had a great deal of serious illness in his family, and was upon one occasion, at least, ill himself. This sickness, however, is not definitely brought within the period where the duty of diligence rested upon appellee. This in itself would not prevent him from claiming poverty as an excuse for delay if because of such illness, no matter when it occurred, it so drained his finances that he was unable through poverty to proceed with the device here in issue as promptly as he would otherwise be required to do. Appellee, in his testimony, does testify that his financial condition prevented him from making application for a patent prior to the time it was made, or from doing anything further than he had with respect to his invention. Unfortunately, however, under instructions from his counsel, he did not answer a very important and material question upon this point. The record discloses the following in the giving of appellee's testimony, during cross-examination:

"Q. Will you please state the several individual items of illness to which you refer giving the time of each? A. My wife went under two operations, North Western Hospital, Dr. Schull being the surgeon in both cases. I was laid up with the Flu at the Lankaneau. The time would have to be looked up in their records.

"Q. What years were they?

"By Mr. Fairbanks: This line of questions prying into petty details of Mr. Kobash's heavy expenses brought on by sickness is earnestly objected to, as immaterial and irrelevant and if it is kept up I shall feel it my duty to suggest that Mr. Kobash need go into this matter in no further detail than he has.

"By Mr. Jackson: This is the beginning only of, a perfectly proper and the usual investigation of the financial affairs of a party who pleads the excuse of poverty for failure to file.

"By Mr. Fairbanks: I object to the discourteous insinuation of poverty in the foregoing remarks as such an expression is wholly unwarranted, and I again request that counsel confine his so called cross-examination within proper and respectable limits.

"Q. What was your salary during this time?

"By Mr. Fairbanks: While I dislike to instruct the witness not to answer I feel it is my duty to now protect Mr. Kobash and I advise him that he need not answer this question unless he wants to, as the amount of his salary is none of the business of the opposing party. Mr. Kobash you need not answer this question unless you want to.

"A. They have records of my salary at the Delaware Storage and Freezing Co."

It is incomprehensible to us why appellee's counsel took the course that he did in preventing this very relevant testimony upon the subject of appellee's poverty if his answer would have tended to sustain his contention. The refusal to answer this very important question of appellee's salary during the period in question prevents us from finding that appellee's testimony is sufficient to excuse the delay in filing his application or actually reducing his device to practice because of financial inability to proceed.

We are therefore compelled to hold with the Examiner of Interferences that appellee was not diligent in reducing his invention to practice, and priority of invention must be awarded to appellant who was second to conceive and first to reduce to practice.

The decision of the Board of Appeals is reversed.

Reversed.